**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| LKQ CORPORATION and KEYSTONE AUTOMOTIVE INDUSTRIES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| ALL CLEAR DIAGNOSTICS AND CALIBRATION LLC, | ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

NOW COMES Plaintiffs, LKQ Corporation ("LKQ") and Keystone Automotive Industries, Inc. ("Keystone") (referred to collectively as "Plaintiffs") by and through their attorneys, FISHER PHILLIPS LLP, and for their Complaint for Injunctive Relief and Monetary Damages states as follows:

## NATURE OF THE ACTION

1.      LKQ and Keystone bring this action against Defendant All Clear Diagnostics and Calibration LLC ("All Clear") for, among other claims: (a) aiding and abetting a then senior management-level employee of LKQ, John Carpenter, ("Carpenter") to breach his fiduciary duties of loyalty owed to Plaintiffs and (b) tortiously interfering with Carpenter's contractual obligations owed to Plaintiffs.  From February 1, 2021 until he resigned on January 6, 2023, LKQ, through its wholly-owned subsidiary, Keystone, employed Carpenter in a senior management role with LKQ's mobile services division, called Elitek Vehicle Services.  As a condition to obtaining and/or continuing his employment with LKQ, and the ability to obtain substantial LKQ restricted stock, Carpenter entered into and agreed to abide by certain non-competition, non-solicitation and

1

confidentiality restrictions that are contained in his LKQ Confidentiality, Non-Competition and Non-Solicitation Agreements and Restricted Stock Unit Agreements.  During his employment, Carpenter also owed fiduciary duties of loyalty and fidelity to LKQ.  Despite this, All Clear, which competes directly with LKQ in marketing, selling and providing the same or similar mobile, on-site vehicle services to customers, and Carpenter participated in a conspiracy to engage in competition with LKQ, recruit LKQ's employees, and to orchestrate a mass exodus of LKQ employees to benefit All Clear, all in breach of Carpenter's fiduciary duties and contractual promises to LKQ.  All Clear induced, aided, and abetting this disloyal conduct in breach of Carpenter's duty of loyalty and in breach of Carpenter's contractual obligations owed to Plaintiffs.  Plaintiffs bring this Complaint to engage in discovery relating to the full scope of this conspiratorial conduct and to obtain injunctive relief and monetary damages arising out of this misconduct.

## **THE PARTIES**

2.      Plaintiff LKQ Corporation was, at all relevant times, and is a Delaware corporation with its principal place of business at 500 W. Madison Street, Suite 2800, Chicago, Illinois.

3.      Plaintiff Keystone Automotive Industries, Inc., was, at all times, and is a California corporation with its principal place of business at 500 W. Madison Street, Suite 2800, Chicago, Illinois.

4.      Defendant All Clear Diagnostics and Calibration LLC ("All Clear") is an Alabama limited liability corporation that was organized under the laws of the State of Alabama, and with its principal place of business at 3066 Zelda Rd, Montgomery, Alabama 36106.  All Clear's members are not residents or citizens of the State of Delaware, Illinois, or California and All Clear

was not a resident or citizen of the State of Delaware, Illinois, or California during the events at issue in the Complaint.

## JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over All Clear because the Court has general jurisdiction over All Clear because it is organized and has its principal place of business and conducts substantial business in this judicial district and has specific jurisdiction because All Clear's tortious and conspiratorial conduct at issue in this Complaint substantially occurred in the State of Alabama.

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Because LKQ (Illinois, Delaware) and Keystone (California, Delaware) are citizens of a different state than All Clear (Alabama), there is complete diversity of citizenship.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claim substantially arises out of incidents or events occurring in this judicial district.

## FACTUAL ALLEGATIONS

A.      **LKQ and Its Mobile On-Site Vehicle Services**

8.      LKQ is, among other things, a national supplier of salvage and aftermarket automobile parts and products to mechanical shops, repair shops, and other customers.  LKQ also markets, sells and provides mobile-onsite vehicle services to its customers, including, but not limited to, owners and operators of trucking and automotive fleets, automotive and mechanical repair facilities, and other trucking and automotive customers.

9.      Keystone is a wholly owned subsidiary of LKQ and is among other things, a leading distributor of specialty automotive equipment and accessories.

FP 46050894.1

10.     In April of 2019, LKQ acquired the assets of two mobile services companies called VeTech Automotive Electronics ("VeTech") and Elite Electronics ("Elite").  The consolidated companies operate under the LKQ brand Elitek Vehicle Services ("Elitek").

11.     Elitek provides sophisticated mobile and on-site technical solutions, including, but not limited to, pre- and post-collision repair diagnostics, ADAS related calibrations, re-flashing, programming, air bag replacements, theft and vandalism repair, frame replacements and full mechanical services to its customers nationwide.

12.     To perform these mobile services, Elitek employs a fleet of mobile technicians who provide on-demand and on-site services for what are typically very time-consuming and demanding repairs.

13.     Elitek's mobile technical services improve LKQ's customers' cycle times and associated repair expenses and provide LKQ's customers with an enhanced customer experience.

14.     LKQ invests significant time, money, and marketing resources to build its brands, including its Elitek brand, in the marketplace, investing in hiring, marketing, advertising, and product and technology development, and fostering long-term customer relationships.

15.     LKQ has accumulated key customer contact information and information relating to business needs and service requirements necessary to develop long-term customer relationships across its entire business, including its Elitek business.

16.     Through these efforts, LKQ has developed a strong reputation in the marketplace and engendered substantial goodwill with its customers, including its Elitek customers who purchase LKQ's mobile, on-site vehicle services.

17.    LKQ conducts its Elitek business throughout the United States, including, but not limited to, in the Southeastern United States and the States of Georgia, Florida, Texas, Kentucky, North Carolina, Tennessee, Alabama, Oklahoma, Texas, and Missouri.

18.    Elitek's net sales revenue (sales revenue minus certain discount and savings allowances) in 2022 was in excess of approximately $53 million.

**B.    All Clear Diagnostics and Calibration**

19.    All Clear competes directly with LKQ's Elitek business in marketing, selling and providing the same or similar mobile, on-site vehicle services to customers.

20.    To perform these mobile services, All Clear also employs a fleet of mobile technicians who provide on-demand and on-site services for repairs.

21.    All Clear sells its service to the same customers and prospective customers to which Elitek markets and sells and provides such services throughout the country, including, upon information and belief, in States in the Southeastern, Midwestern, and Southwestern United States.

22.    Additionally, All Clear is seeking to expand into and compete with LKQ in new markets across the United States.

**C.    Carpenter's Employment with LKQ**

23.    Carpenter began his employment with LKQ on or about February 1, 2021.

24.    During the period of February 1, 2021 until approximately September 2022, LKQ employed Carpenter as an Area Manager for Mobile Automotive Tech for the Elitek business, with managerial and supervisory authority over a territory encompassing part or all of the States of Texas, Oklahoma, Kansas, Arkansas, and Missouri.

25.     Commensurate with his job duties in a senior management position, LKQ has paid Carpenter a six-figure compensation package, including salary, bonuses, and other compensation. Carpenter's gross annualized compensation has exceeded $140,000.

26.     As an Area Manager, Carpenter was responsible for the day-to-day operational and financial management relating to LKQ's Elitek business and customers.  Carpenter had direct control and responsibility for recruiting and hiring staff, managing staff, employee safety, business development, marketing, sales, and client account services.

27.     By virtue of his management position, Carpenter was responsible for safeguarding and growing LKQ's workforce and business.

28.     Carpenter also had profit and loss responsibility and specific revenue, sales, and profitability goals.  Carpenter was also responsible for assisting in annual business planning, strategic planning, and business forecasting.

29.     Carpenter's duties as an Area Manager of the Elitek mobile business also included managing and participating in sales to prospective and existing customers, interacting with customers, implementing marketing and sales initiatives and promotions, developing and maintaining relationships with customers, and managing customer retention.

30.     Carpenter's ability to develop and maintain key customer relationships was critical to LKQ's efforts to drive sales and retention.

31.     In September of 2022, Carpenter began performing the role of Manager of Special Projects.

32.     In this role, Carpenter reviewed the business practices of Elitek's mobile technicians on a national basis.

33.     Carpenter evaluated the work of Elitek's technicians relating to, among other things, work orders, invoices, insurance tools, the implementation of work orders, and identifying business opportunities with respect to customer orders.  Carpenter then conducted supervisory training with technicians and their supervisors on how to implement best practices on each of these aspects of a technician's job.

34.     Notably, in the position of Manager of Special Projects, Carpenter had access to sales, pricing, and order information for Elitek technicians and work assignments that were performed throughout the country.

35.     Additionally, and in November of 2022, Carpenter specifically requested access to a broader array of LKQ's national sales and order information.  Upon information and belief, Carpenter was seeking information which could then be used to unlawfully compete with LKQ and for the benefit of All Clear.

36.     During the course of his employment, Carpenter received training and/or instruction relating to LKQ's Elitek marketing, sales, and technical processes, techniques, and methodologies.  This included, among other things, training and instruction relating to the development and management of customer relationships, sales and marketing plans, servicing LKQ's Elitek customers, the technical support of LKQ's Elitek sales and product initiatives, and contractual agreements with customers.

37.     In his capacity as an Area Manager and Manager of Special Projects of the Elitek mobile business, Carpenter has had access to LKQ's customer information, customer requirements, pricing information for customers, historical sales, sales plans and proposals, financial performance, margins, and agreements relating to LKQ's Elitek mobile business.

7

38.     This information has substantial commercial and competitive value because it is not generally known to or readily ascertainable through proper means by competitors who can obtain economic value from this information.

39.     LKQ takes reasonable measures to protect its confidential business and trade secret information, including, but not limited to, requiring passwords to be used to access Company computer systems and records, and having policies that expressly prohibit the use, removal, and disclosure of such information outside the Company.

**D.    Carpenter and LKQ Enter Into a Confidentiality Agreement and a Confidentiality, Non-Competition and Non-Solicitation Agreement.**

40.     As a condition of his employment and continued employment with LKQ, Carpenter entered into a Confidentiality Agreement, dated February 10, 2021 (the "2/10/21 Confidentiality Agreement") and an LKQ Corporation Confidentiality Non-Competition and Non-Solicitation Agreement, dated February 1, 2021 (the "2/1/21 Restrictive Covenant Agreement"). *See* True and Correct Copies of 2/10/21 Confidentiality Agreement and the 2/1/21 Restrictive Covenant Agreement, attached hereto at Exhibits A and B.

41.     Pursuant to Section 1 of the 2/10/21 Confidentiality Agreement, Carpenter agreed that he:

> [ . . .] shall not, and agrees to cause its Affiliates (as defined below) not to, use for personal benefit, disclose, communicate or divulge, or use for the direct or indirect benefit of any other person, firm, association, partnership, corporation or other entity (other than LKQ) the Confidential Information.  All Confidential Information shall be the sole property of LKQ, and Confidant hereby assigns to LKQ any rights it has or may acquire in such Confidential Information, by whatever means.
> Exhibit A at Section 1.

42.     Section 7 of the 2/10/21 Confidentiality Agreement defines "Affiliate" to mean, with respect to a specified person, any other person which directly, or indirectly, through one or

more intermediaries, controls, is controlled by, or is under common control with, the person specified, including but not limited to [Carpenter's] agents, employees and representatives. *Id.* at Section 7.

43. Furthermore, Section 3 of the 2/10/21 Confidentiality Agreement provides:

> [Carpenter] acknowledges that the execution of this Confidentiality Agreement does not guarantee that LKQ will enter into or remain in a business relationship with Confidant or its Affiliates. Confidant agreed to be bound by the terms of this Confidentiality Agreement regardless of whether Confidant or its Affiliates and LKQ are in a business relationship.
> Exhibit A at Section 3.

44. Section 4 of the 2/10/21 Confidentiality Agreement provides:

> Any breach of the provisions of this Confidentiality Agreement shall cause irreparable harm to LKQ, and therefore, in the event of a breach or threatened breach of the provisions of this Confidentiality Agreement, LKQ shall be entitle to an injunction restraining Confidant from disclosing or approaching in whole or in party, the Confidential Information, or from rendering any services to any person, firm, association, partnership, corporation, or other entity to whom such Confidential Information, in whole or in part, has been disclosed or is threatened to be disclosed, or to whose benefit such Confidential Information is being used or threatened to be used. Nothing herein shall be construed as prohibiting LKQ from pursing any other remedies available for such breach or threatened breach, including the recovery of damages. Confidant does further consent and agree to indemnify, hold harmless, reimburse and pay LKQ for any and all attorneys fees and other costs for whatever nature incurred by LKQ in seeking and obtaining this injunctive relief.
> Exhibit A at Section 3.

45. Sections 1, 2, and 3 of the 2/1/21 Restrictive Covenant Agreement provide, in part:

> 1.    **Non-Disclosure of Confidential Information**.  [ . . .] Employee agrees that at all times, both during and after Employee's employment with Employer, Employee shall keep confidential all Confidential Information and shall not (directly or indirectly) disclose or use (except as necessary to carry out Employee's duties for Employer) any such Confidential Information. [ . . .]
> 2.    **Non-Competition**.  Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and

9

for a period of nine months following the termination of Employee's employment with Employer (i) by Employee for any reason, or (ii) by Employer for cause, engage in, represent, furnish consulting services to, be employed by or have any interest in (whether as owner, principal, director, officer, partner, agent, consultant, lender, shareholder, member or otherwise) any business that would be competitive with any business conducted by Employer or its subsidiaries on the date of this Agreement or any other business conducted by Employer or its subsidiaries during Employee's employment, anywhere within a 75 mile radius of any facility of Employer or its subsidiaries at which Employee worked or over which Employee exercised managerial control while employed by Employer; provided, however, that the post-termination restriction of this Section 2 shall not apply in any jurisdiction in which such restrictions are invalid or unenforceable under applicable law then in effect; provided further, however, Employee may acquire and hold an aggregate of up to two percent of the outstanding shares of any corporation engaged in any such business if such shares are publicly traded in an established securities market. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

3.    **Non-Solicitation**.   Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination (for any reason) of Employee's employment with Employer, induce any customer of Employer or its subsidiaries to patronize any other business, request or advise any other person or entity with which the Employer has a business relationship (including customers and suppliers) to withdraw, curtail or cancel any of its business with Employer or its subsidiaries, or solicit for employment, or assist any other person or entity in soliciting for employment, any person employed by any of Employer or its subsidiaries. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

Exhibit B at Sections 1, 2, & 3.

46.    The 2/1/21 Restrictive Covenant Agreement permits LKQ to seek both injunctive relief and damages should Carpenter breach the terms of this Agreement. *See* Exhibit B at Section 6.

47.     Both the 2/10/21 Confidentiality Agreement and the 2/1/21 Restrictive Covenant Agreement provide that they are governed by Illinois law and the 2/1/21 Restrictive Covenant Agreement contains an Illinois forum selection clause.  *See* Exhibit A at Section 5, and Exhibit B at Section 7-8.

**E.    Carpenter and LKQ Enter Into Restricted Stock Unit Agreements in 2021 and 2022.**

48.     Beginning in 2021, and in consideration of his substantial responsibility in a senior manager position, LKQ designated Carpenter a "Key Person" and made him eligible for substantial grants of LKQ stock in accordance with LKQ's equity compensation incentive plan.

49.     On or about February 19, 2021, and February 18, 2022, LKQ and Carpenter entered into a separate "Restricted Stock Unit Agreement" providing Carpenter with the right to exercise shares of LKQ stock pursuant to the terms, conditions, and vesting schedules set forth in the respective agreements.  *See* True and Correct Copies of LKQ and Carpenter's 2021 and 2022 Restricted Stock Unit Agreements, attached hereto at Exhibits C and D (referred to collectively as the "RSU Agreements" and individually as the "2021 RSU Agreement" and the "2022 RSU Agreement").

50.     As a material inducement for LKQ to enter into these agreements and provide Carpenter with substantial equity compensation, Carpenter agreed to the following restrictive covenants ending nine months after Carpenter's separation of employment with LKQ (referred to collectively as the "RSU Restrictive Covenants").

51.     Pursuant to the RSU Agreements, Carpenter agreed to the following non-competition, non-solicitation, and confidentiality covenants "during the period commencing on the Grant Date and ending nine months following the Key Person's Separation of Service...":

17.     Non-Competition and Confidentiality...

11

(a)(i)   the Key Person shall not directly or indirectly (1) be employed by, engage or have any interest in any business which is or becomes competitive with the Company or its Subsidiaries or is or becomes otherwise prejudicial to or in conflict with the interests of the Company or its Subsidiaries, (2) induce any customer of the Company or its Subsidiaries to patronize such competitive business or otherwise request or advise any such customer to withdraw, curtail or cancel any of its business with the Company or its Subsidiaries or (3) hire or solicit for employment any person employed by the Company or its Subsidiaries or hire any person who was employed by the Company or its Subsidiaries at any time within nine months of such hire; provided, however, that this restriction shall not prevent the Key Person from acquiring and holding up to two percent of the outstanding shares of capital stock of any corporation which is or becomes competitive with the Company or is or becomes otherwise prejudicial to or in conflict with the interests of the Company if such shares are available to the general public on a national securities exchange or in the over-the-counter market; and

(ii)   the Key Person shall not use or disclose, except for the sole benefit of or with the written consent of the Company, any confidential information relating to the business, processes or products of the Company. Nothing in this Agreement, however, prohibits the Key Employee from reporting violations of law or regulation to any U.S. federal, state or local governmental or law enforcement branch, agency or entity (collectively, a "Governmental Entity"), or from cooperating with any Governmental Entity, including the EEOC, the Securities and Exchange Commission or the Department of Justice.

*See* RSU Agreements, Section 17, Exhibits C & D.

52.   Under the terms of the RSU Agreements, LKQ and Carpenter also agreed that, if the "Key Person" is not in compliance with the restrictive covenants set forth in the respective RSU Agreements, then Carpenter agreed to forfeit his restricted stock and related proceeds as set forth below:

…the RSUs, the Shares underlying the RSUs and any proceeds received by the Key Person upon the sale of Shares underlying the RSUs shall be forfeited by the Key Person to the Company without any consideration therefore, if the Key Person is not in compliance, at any time during the period commencing on the Grant Date and

> ending nine months following the Key Person's Separation from
> Service…

*See* RSU Agreements, Section 17, Exhibits C & D.

53.    Further, the parties agreed to the following provisions governing the forfeiture and/or repayment of the restricted stock units under the RSU Agreements as follows:

> The forfeiture shall be effective as of the date of the occurrence of
> any of the activities set forth in Section 17(a) above. If the Shares
> underlying the RSUs have been sold, the Key Person shall promptly
> pay to the Company the amount of the proceeds from such sale.

*See* RSU Agreements, Section 17(b), Exhibits C & D.

54.    In addition, the parties agreed that LKQ "shall be" entitled to injunctive relief for any violation of the RSU Restrictive Covenants in Section 17 of the 2021 and 2022 RSU Agreements.  *See* RSU Agreements, Section 17, Exhibits C & D.

55.    Section 20 of the 2021 and 2022 RSU Agreements further expound upon LKQ's right to claw back, cancel, and recoup any and all amounts received by Carpenter under LKQ's equity incentive plan and in accordance with any applicable law.  *See* RSU Agreements, Section 20, Exhibits C & D.

56.    LKQ and Carpenter further agreed that: "any and all actions concerning any dispute arising hereunder shall be filed and maintained only in a state or federal court sitting in the County of Cook, State of Illinois.  The parties hereto specifically consent and submit to the jurisdiction of such court."  *See* RSU Agreements, Section 15, Exhibits C & D.

57.    The RSU Agreements provide that they are governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to principles and provisions thereto relating to conflict or choice of laws.  *Id.*

FP 46050894.1

58.     Carpenter reviewed, assented to, and accepted each of the 2021 and 2022 RSU Agreements.  Carpenter's acceptance was manifested using his unique login identification and user password.  LKQ's equity management software, Certent, shows the specific date and time that Carpenter accepted each grant and the corresponding contractual documents accepted within the grant package.

59.     Carpenter's acceptance of the respective RSU Agreements was also manifested based on his performance under the RSU Agreements, including the vesting and granting of restricted stock units to Carpenter, in accordance with the terms and conditions of the respective RSU Agreements.  To date, Carpenter has received grants under the RSU Agreements of restricted stock units in excess of $28,000.

**F.    Carpenter and LKQ Enter Into RCA Agreements.**

60.     In consideration of LKQ's agreement to issue him restricted stock under the RSU Agreements and his continued employment and other compensation as an Area Manager, Carpenter also entered into Confidentiality, Non-Competition, and Non-Solicitation Agreements with LKQ on or about the same dates as the RSU Agreements (i.e., *See* True and Correct Copies of the February 19, 2021, and February 18, 2022 Confidentiality, Non-Competition, and Non-Solicitation Agreements, attached hereto at Exhibits E and F (referred to collectively as the "RCAs" and individually as the "2021 RCA" and the "2022 RCA").

61.     Carpenter reviewed, assented to, and accepted the 2021 and 2022 RCAs and manifested his acceptance through his unique login identification and user password.  *See* 2021 and 2022 RCAs, Exhibits E & F.

62.     The language in the RCAs referenced below is the same for each Agreement.

63.     Pursuant to the language in the RCA's: "Employee desires to receive a grant of an equity incentive award from Employer under the Employer's 1998 Equity Incentive Plan…"  *See* RCAs, pp. 1, Exhibits E & F.  "NOW THEREFORE, in consideration of the grant of the equity incentive award to Employee as of the date of this Agreement and in consideration of Employee's employment by and with Employer or one of its subsidiaries (this Agreement being a condition of such award grant and employment), Employer and Employee agree to the following conditions..." set forth in the RCAs.  *Id.*

64.     In other words, the granting of restricted stock by LKQ was also conditioned on Carpenter's agreement to be bound by the separate promises contained in the RCAs.

65.     Under the terms of each of the RCAs, Carpenter agreed to and entered into a Non-Competition covenant ("Non-Competition Covenant").  *Id.*  Pursuant to this covenant:

> 2.     <u>Non-Competition</u>. Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination of Employee's employment with Employer (i) by Employee for any reason, or (ii) by Employer for cause, engage in, represent, furnish consulting services to, be employed by or have any interest in (whether as owner, principal, director, officer, partner, agent, consultant, lender, shareholder, member or otherwise) any business that would be competitive with any business conducted by Employer or its subsidiaries on the date of this Agreement or any other business conducted by Employer or its subsidiaries during Employee's employment, anywhere within a 75 mile radius of any facility of Employer or its subsidiaries at which Employee worked or over which Employee exercised managerial control while employed by Employer; ***provided, however*, that the post-termination restrictions of this Section 2 shall not apply in any jurisdiction in which such restrictions are invalid or unenforceable under applicable law then in effect;** provided further, however, Employee may acquire and hold an aggregate of up to two percent of the outstanding shares of any corporation engaged in any such business if such shares are publicly traded in an established securities market. Notwithstanding the foregoing, the period of time following termination of employment during

which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

*See* RCAs, Section 2, Exhibits E & F (bold and italics in original).

66.    Also under the terms of the RCAs, Carpenter entered into a Non-Solicitation covenant ("Non-Solicitation Covenant"). *Id.* Pursuant to this covenant:

3. <u>Non-Solicitation</u>. Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination (for any reason) of Employee's employment with Employer, induce any customer of Employer or its subsidiaries to patronize any other business, request or advise any other person or entity with which the Employer has a business relationship (including customers and suppliers) to withdraw, curtail or cancel any of its business with Employer or its subsidiaries, or hire or solicit for employment, or assist any other person or entity in hiring or soliciting for employment, any person employed by any of Employer or its subsidiaries. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

*See Id.*, Section 3.

67.    Under each of the RCAs, the parties agreed that, in the event a provision is found to be unenforceable or invalid, a court shall have the power to reduce the duration and/or area of any restrictive covenant contained therein or delete or sever a provision to render the agreement enforceable as follows:

If any provision of this Agreement, as applied to any party or to any circumstances, is adjusted by a court to be invalid or unenforceable, the same shall in no way affect any other provision or any other part of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. If any such provision, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such

provision, and/or to delete specific words or phrases, and in its reduced form such provision shall then be enforceable.

*See Id.*, Section 5.

68.     Also under the terms of the RCAs, LKQ and Carpenter agreed that, "[a]ny and all actions concerning any dispute arising hereunder shall be filed and maintained only in a state or federal court sitting in the County of Cook, State of Illinois.  The parties specifically consent and submit to the jurisdiction of such court."  *See Id.*, Section 8.

69.     The RCAs provide that they shall be governed by and construed in accordance with the laws of the state in which the Employee resides without regard to the conflict of laws rules thereof.  *See Id.*, Section 7.

70.     The RCAs provide that the non-breaching party shall be entitled to injunctive relief in addition to monetary damages sustained as a result of each breach.  *See Id.*, Section 6.

71.     The covenants and restrictions contained in the 2021 and 2022 RSU Agreements, and the 2021 and 2022 RCAs are reasonable in scope and duration and are necessary to protect LKQ's legitimate business interests in their confidential information, goodwill, and customer and employee relationships, among other interests.

## G.     Carpenter And All Clear Conspire to Engage in Unfair Competition in Violation of Carpenter's Fiduciary Duty of Loyalty and Contractual Obligations to LKQ.

72.     In October of 2022, All Clear hired another LKQ Area Manager named Coy Skipper, a former Area Manager for LKQ's Elitek business.

73.     At the time of his resignation, Skipper stated that he was resigning to pursue his "long term goal of being in real estate."

74.     After Skipper's employment with LKQ ended, however, LKQ learned that Skipper had begun a new position as a Southeast Regional Manager for All Clear.

75.     Through Skipper's employment with LKQ, upon information and belief, All Clear was and has been aware that LKQ and Skipper entered into RSU Agreements in 2021 and 2022, and RCAs in 2021 and 2022 that contain the same substantive terms and conditions as the agreements into which Carpenter entered into, including the non-competition covenants and customer and employee non-solicitation covenants.

76.     Like Skipper, Carpenter has been an Area Manager with LKQ's Elitek business during a similar period of time and is subject to the same terms and conditions of employment, of which All Clear had knowledge through its employment of Skipper.

77.     Nevertheless, upon information and belief, All Clear began a deliberate and premeditated campaign to "destroy" Elitek's business, using Carpenter as a knowing accomplice in an attempt to secret its recruiting efforts in contravention of LKQ's covenants with its employees.

78.     As an Area Manager and Manager of Special Projects for LKQ, Carpenter owed LKQ a fiduciary duty of loyalty and fidelity, separate and apart from his contractual promises to LKQ to which he was bound.

79.     Upon information and belief, and upon being approached by agent(s) of All Clear and being induced by those agents to act in the interest of All Clear, contrary to the interest of LKQ, Carpenter engaged in a malicious campaign to orchestrate a mass exodus of LKQ employees for the benefit of All Clear.

80.     Carpenter would not have engaged in a campaign to orchestrate a mass exodus of LKQ employees for All Clear in the absence of an inducement from All Clear.

FP 46050894.1

81.    Carpenter's conduct included the direct solicitation of LKQ employees in various geographic markets to leave employment with LKQ and to accept substantially similar employment with All Clear.

82.    As a senior management employee who was intimately familiar with the terms and conditions of LKQ's Elitek employees, Carpenter knew that many if not all of these employees had contractual agreements with LKQ that also contained confidentiality, non-competition, and customer and employee non-solicitation covenants, including agreements that were substantively similar to his agreements with LKQ.

83.    In his solicitation, Carpenter touted the benefits of employment with All Clear and provided LKQ employees with specific compensation information, including information relating to salaries, bonuses, and health care and retirement benefits they would receive through employment with All Clear, to actively induce and persuade employees to leave their employment.

84.    In his solicitation, Carpenter intimated that he was convincing multiple other LKQ employees throughout the country to leave employment with LKQ for new employment with All Clear, and explicitly stated that Elitek would cease to exist in certain markets.

85.    In his solicitation, Carpenter further conveyed a plan whereby employees of LKQ would submit resumes to All Clear as if they were affirmatively seeking a position with All Clear, while secretly including a notation indicating that they had been recruited by and would be exiting LKQ with Carpenter.

86.    Further, Carpenter's plan and conduct demonstrates the level of complicity and coordination between All Clear and Carpenter.

87.     Upon information and belief, Carpenter's conduct was based on the authority to implicitly or explicitly make promises relating to employment with All Clear, including promises relating to compensation.

88.     Carpenter's conduct in recruiting LKQ's employees also demonstrated a wide-ranging knowledge of All Clear's business practices (such as what type of vehicle an employee might receive) and its plans to compete in various, specific markets across the United States.

89.     Carpenter's conduct also demonstrated a knowledge of All Clear's recruiting practices and effort to submit resumes to All Clear in a premeditated manner and effort to make it appear as if All Clear was not directly and affirmatively involved in the recruiting of LKQ employees.

90.     Upon information and belief, and due to its knowledge of LKQ's contractual agreements, All Clear orchestrated this plan in an attempt to avoid potential legal liability for claims such as tortious interference with contract.

91.     In short, all roads lead back to a single source – All Clear.

92.     On January 3, 2023, LKQ received notice from no less than 15 LKQ employees (the "Departed Employees") working for the Elitek business that they were resigning their employment with LKQ.  Upon information and belief, each of these employees will commence employment with All Clear, and are the result of All Clear, Carpenter, and potentially others' efforts to recruit LKQ employees.

93.     Upon learning of these resignations and Carpenter's involvement as articulated above, LKQ immediately suspended his employment and began an investigation.

94.     On January 6, 2023, Carpenter resigned from his employment with LKQ.

95.     Upon information and belief, Carpenter intends to or already has joined All Clear in a position that is similar to the position he held at LKQ.

96.     Through this coordinated effort to "destroy" Elitek's business, Carpenter has, upon information and belief, relied upon, utilized and disclosed LKQ's confidential information relating to its employees, customer contracts, pricing, financial information, gross margins and other customer-related data to improperly and unfairly take business away from LKQ and direct the business to All Clear in violation of his fiduciary obligations to LKQ.

97.     Upon information and belief, Carpenter has relied upon, utilized and disclosed LKQ's confidential information relating to its customer contracts, pricing, financial information, gross margins and other customer-related data in order to unfairly take business away from LKQ.

98.     As a result of the foregoing, LKQ has sustained damages, including, but not limited to, the loss of capital; the uncompensated loss of the exclusive use of its confidential information; loss of valuable business; loss of and/or damage to its assembled workforce; costs incurred and that LKQ will incur to retain its workforce; the loss of profits and future profits; the loss of goodwill; and other damages, all in an amount to be determined at trial, and all of which damages are ongoing and continue unabated at the time of the filing of this Complaint.

99.     Carpenter's violations of his contractual agreements and fiduciary obligations to LKQ and All Clear's tortious conduct are irreparably harming the Company's legitimate business interests, including its customer and employee relationships, good will, and confidential information, among other interests.

100.    Carpenter and All Clear's unlawful actions are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of LKQ, entitling LKQ to an award of punitive damages.

FP 46050894.1

101. The damages that LKQ has incurred to date arising from All Clear's unlawful conduct is in excess of $75,000.

102. All Clear's unlawful actions are ongoing and demonstrate All Clear and Carpenter's intent to continue this misconduct unabated.

## COUNT I
### Aiding and Abetting Breach of the Fiduciary Duty/Duty of Loyalty

103. The allegations of Paragraphs 1 through 102 are incorporated herein by reference with the same force and effect as if set forth in full below.

104. Carpenter held a senior management position at LKQ and was responsible for the supervision of employees, including employees who departed LKQ to work for All Clear.

105. By virtue of his management positions, Carpenter was responsible for safeguarding and growing LKQ's workforce, as well as administering and enforcing LKQ's contractual rights and corporate policies.

106. During his employment with LKQ, Carpenter owed fiduciary duties of loyalty and fidelity to LKQ arising out of his relationship as an employee, agent and/or representative of LKQ.

107. Indeed, as a result of his position of authority and managerial responsibility, Carpenter had a heightened duty of loyalty and a confidential relationship with LKQ.

108. Upon information and belief, and as LKQ expects to establish upon further discovery, while employed by LKQ, Carpenter intentionally and secretly planned to leave the employment of LKQ to work for All Clear, and further solicited employees to resign *en masse* to work for All Clear so as to maximize the disruption to LKQ's business and to gain an unfair, illegal competitive advantage as a direct result of his conduct and actions.

22

109.    Carpenter's conduct included the direct solicitation of LKQ employees in various geographic markets to leave employment with LKQ and to accept substantially similar employment with All Clear.

110.    Carpenter conveyed specific business information and compensation plans to LKQ employees relating to employment with All Clear and the benefits of leaving employment with LKQ to work for All Clear.

111.    Carpenter's plan and conduct demonstrates the level of complicity and coordination between All Clear and Carpenter, and that All Clear and Carpenter were not only working against LKQ's interest, but also seeking to maximize the damage to LKQ's ability to compete in the mobile, on-site technician market in which All Clear conducts business.

112.    Carpenter's conduct served the competitive and economic interest of All Clear and was in direct contravention of the interest of LKQ.

113.    Upon information and belief, Carpenter and All Clear secreted this plan to affirmatively recruit LKQ employees in a conspiratorial effort to shield All Clear from potential liability and tortious conduct given its knowledge of LKQ's contractual agreements with Carpenter and other LKQ employees.

114.    Upon information and belief, Carpenter intentionally misappropriated LKQ's confidential information, while he was an employee of LKQ, for his own interests and the interests of All Clear, and to LKQ's direct detriment.

115.    All Clear knew, or should have known, of Carpenter's employment and position with LKQ and his fiduciary duties/duties of loyalty to LKQ.

116.    All Clear knew, or should have known, of Carpenter's contractual promises to LKQ relating to non-competition, non-disclosure, and customer and employee non-solicitation.

117.    Upon information and belief, All Clear induced, aided, abetted, and provided substantial support to Carpenter in violating his fiduciary duties/duties of loyalty by committing one or more of the wrongful acts described herein.

118.    Further, All Clear knew, or should have known, that Carpenter's efforts to recruit LKQ employees during his employment were in breach of his fiduciary obligations to LKQ, and it knowingly retained the benefits of this unlawful competition and solicitation, including, but not limited to, the benefit of the employment of individuals who left employment with LKQ to work for All Clear.

119.    All Clear's and Carpenter's conduct, as set forth herein, was and is without privilege or justification.

120.    As a direct and proximate result of the foregoing, LKQ has sustained damages, including, but not limited to, the loss of capital; the uncompensated loss of the exclusive use of its confidential information; loss of valuable business; loss of and/or damage to its assembled workforce; costs incurred and that LKQ will incur to retain its workforce; the loss of profits and future profits; the loss of goodwill; and other damages, all in an amount to be determined at trial, and all of which damages are ongoing and continue unabated at the time of the filing of this Complaint.

121.    The acts described herein constitute misconduct and/or demonstrate actual malice or such recklessness or negligence as to evince a conscious disregard of the rights of others.

122.    But for an exercise of the equitable powers of this Court, LKQ has no adequate remedy at law to address and/or compensate LKQ for Carpenter's and All Clear's unfair competition.

123.    LKQ is likely to succeed on the merits of its claim.

FP 46050894.1

124.    LKQ requests that the Court enter judgment on Count I in its favor and against All Clear and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT II
### Tortious Interference with Contract

125.    The allegations of Paragraphs 1 through 124 are incorporated herein by reference with the same force and effect as if set forth in full below.

126.    At all relevant times, LKQ had a valid and enforceable contractual relationship with Carpenter as set forth in the 2/10/21 Confidentiality Agreement, the 2/1/21 RCA, the 2021 and 2021 RCAs, and the 2021 and 2022 RCAs.

127.    LKQ has performed all conditions precedent to the enforcement of each of these agreements.

128.    Upon information and belief, and based on its employment of Skipper and recruitment and interactions with LKQ's employees (including Carpenter), All Clear was aware of and had reason to know that LKQ had entered into a valid and binding contractual agreement with Carpenter and other Departed Employees that contained confidentiality, non-competition, and customer and employee non-solicitation covenants, as set forth in the 2/10/21 Confidentiality Agreement, the 2/1/21 RCA, the 2021 and 2022 RCAs, and the 2021 and 2022 RCAs.

129.    LKQ's contractual agreements with Carpenter prohibited him from, among other things, engaging in competition with LKQ, soliciting LKQ's employees and customers, and disclosing LKQ's confidential information as set forth in the above agreements.

130.    Specifically, Carpenter's competitive conduct, solicitation of LKQ employees, and use and disclosure and inevitable use and disclosure of LKQ's confidential business information, and other conduct on behalf of All Clear, constitute separate and independent breaches of the

employment and post-employment prohibitions in Section 17 of the RSU Agreements, including Sections 17(a)(i)(1) (the non-competition covenant), and 17(a)(i)(3) (the non-solicitation covenant), and 17(a)(ii) (non-disclosure of confidential information covenant) in each of the 2021 and 2022 RSU Agreements.

131.    Carpenter's competitive employment, solicitation of LKQ employees, and use and disclosure and inevitable use and disclosure of LKQ's confidential business information, and other conduct on behalf of All Clear, constitute separate and independent breaches of the prohibitions in Section 1 (the non-disclosure of confidential information covenant), Section 2 (the non-competition covenant), and Section 3 (the non-solicitation of customers and LKQ employees' covenant) in each of the 2021 and 2022 RCAs.

132.    Carpenter's competitive employment, solicitation of LKQ employees, and use and disclosure and inevitable use and disclosure of LKQ's confidential business information and other conduct on behalf of All Clear, constitute separate and independent breaches of the prohibitions in Section 1 (the non-disclosure of confidential information covenant), Section 2 (the non-competition covenant), and Section 3 (the non-solicitation of customers and LKQ employees' covenant) of the 2/1/21 Restrictive Covenant Agreement.

133.    Further, Carpenter knew and All Clear knew or had reason to know that one or more of the Departed Employees had non-disclosure, non-competition, and non-solicitation covenants that were identical or substantially similar in substance to Skipper and Carpenter's covenants.

134.    Upon information and belief, and during Carpenter's employment, All Clear and Carpenter worked in tandem and actively solicited and recruited LKQ's employees to leave their employment with LKQ for the benefit of All Clear and to work for All Clear.

135.    Carpenter actively solicited and recruited LKQ's employees to leave their employment to work for All Clear in breach of his non-solicitation covenants to LKQ and engaged in competition in violation of his non-competition covenants to LKQ as set forth herein.

136.    Upon information and belief, Carpenter's misconduct as described herein, was aided, abetted, and induced by All Clear.

137.    All Clear knew that its actions would cause a breach of the contractual relationship between Carpenter and LKQ.

138.    All Clear knowingly, intentionally, and purposefully participated in the act of interfering with LKQ's contractual agreement with Carpenter.

139.    All Clear has no justification or excuse to interfere with LKQ's contractual relationship with Carpenter because All Clear and Carpenter's conduct was in furtherance of a conspiracy that they knew would result in and was resulting in the breach of Carpenter's contractual obligations to LKQ in real time.

140.    All Clear's wrongful interference is motivated by its improper and deceitful attempts to obtain an unfair competitive advantage in the marketplace.

141.    As a result of the foregoing, LKQ has suffered damages, including, but not limited to, the loss of capital; the uncompensated loss of the exclusive use of its confidential information; loss of valuable business; loss of and/or damage to its assembled workforce; costs incurred and that LKQ will incur to retain its workforce; the loss of profits and future profits; the loss of goodwill; and other damages, all in an amount to be determined at trial, and all of which damages are ongoing and continue unabated at the time of the filing of this Complaint.

142.    The acts described herein constitute misconduct and/or demonstrate actual malice or such recklessness or negligence as to evince a conscious disregard of the rights of others.

FP 46050894.1

143.    But for an exercise of the equitable powers of this Court, LKQ has no adequate remedy at law.

144.    LKQ is likely to succeed on the merits of its claim.

145.    LKQ requests that the Court enter judgment on Count II in its favor and against All Clear and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT III
### Civil Conspiracy

146.    The allegations of Paragraphs 1 through 145 are incorporated herein by reference with the same force and effect as if set forth in full below.

147.    Upon information and belief, and as LKQ expects to establish upon discovery, Carpenter, All Clear, and/or one or more of the Departed Employees (between them and with others) formed and operated a malicious combination with a common purpose to injure LKQ by (a) performing unlawful acts by violating LKQ's contractual, statutory, and common law rights as described above for the unlawful purpose of diverting business, employees, and customers for their economic benefit from LKQ, and/or (b) performing the acts of competing with LKQ and hiring certain LKQ employees, and did so through the unlawful means of violating LKQ's statutory, contractual, and common law rights as described above.

148.    All Clear's unlawful conduct includes induces, aiding, and abetting a breach of Carpenter's duty of loyalty and its tortious interference with LKQ's agreements with Carpenter.

149.    The foregoing conduct of Carpenter and All Clear was malicious, was performed with intent to injure LKQ, and was without justification or privilege.  Carpenter and All Clear's conduct was undertaken in furtherance of their own personal interests and for the benefit of All Clear.

FP 46050894.1

150.    One or both of Carpenter and All Clear engaged in overt unlawful acts and conduct violative of LKQ's statutory, contractual, and common law rights as described above, causing actual harm to LKQ.

151.    By virtue of the formation and operation of this conspiracy by Carpenter and All Clear, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to LKQ thereby, each individual/entity as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each defendant/co-conspirator.

152.    As a result of the foregoing, LKQ has suffered damages, including, but not limited to, the loss of capital; the uncompensated loss of the exclusive use of its confidential information; loss of valuable business; loss of and/or damage to its assembled workforce; costs incurred and that LKQ will incur to retain its workforce; the loss of profits and future profits; the loss of goodwill; and other damages, all in an amount to be determined at trial, and all of which damages are ongoing and continue unabated at the time of the filing of this Complaint.

153.    The acts described herein constitute misconduct and/or demonstrate actual malice or such recklessness or negligence as to evince a conscious disregard of the rights of others.

154.    But for an exercise of the equitable powers of this Court, LKQ has no adequate remedy at law.

155.    LKQ is likely to succeed on the merits of its claim.

156.    LKQ requests that the Court enter judgment on Count III in its favor and against All Clear and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT IV

**Unjust Enrichment**

157.    The allegations of Paragraphs 1 through 156 are incorporated herein by reference with the same force and effect as if set forth in full below.

158.    Pleading in the alternative, and without prejudice to Plaintiffs' above allegations and claims, Carpenter and All Clear have been unjustly enriched based on their conduct, and to Plaintiffs' detriment, through the misconduct, breach of fiduciary duties, aiding and abetting of a breach of fiduciary duties, tortious interference, and unfair competition set forth and as alleged above.

159.    All Clear's conduct as described herein constitutes circumstances wherein it would be manifestly unjust, grossly unfair, and unconscionable to allow All Clear to retain any benefit or profit generated or derived from Carpenter's breach of his fiduciary duties and contractual obligations to LKQ and All Clear's aiding and abetting of these breaches and tortious interference with contract, including the profits or benefits derived from the Departed Employees.

160.    Plaintiffs request that the Court enter judgment on Count IV in its favor and against All Clear and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## REQUESTS FOR RELIEF

WHEREFORE, LKQ and Keystone request that this Court:

A.    Enter a preliminary and then a permanent injunction, restraining and enjoining All Clear, whether directly or indirectly, alone or in concert with other persons or corporate entities until further Order of this Court, from:

1.    soliciting or continuing to solicit any other LKQ employees whom All Clear and Carpenter, while he was employed by LKQ, had directly or indirectly solicited

and/or communicated with, or identified to All Clear, for the purpose of recruiting those employees to leave LKQ and join All Clear;

2.      employing or retaining Carpenter, for nine (9) months from the date of Carpenter's resignation from LKQ, in any position that would violate the post-employment non-competition restrictions contained in his agreements with LKQ;

3.      using, disclosing, relying upon, or retaining any of LKQ's Confidential Information, as defined in Carpenter's Agreements with LKQ, for any purpose.

B.      Enter judgment on all Counts of the Complaint in favor of LKQ and Keystone, and order All Clear to pay all damages allowable by law to LKQ and Keystone including, without limitation, all damages caused by All Clear's unlawful competition in violation of his agreements with LKQ; compensatory and consequential damages to LKQ and Keystone in an amount to be determined at trial; an award in favor of LKQ and Keystone for its costs and attorneys' fees associated with this action; an award of punitive damages to LKQ and Keystone in an amount to be determined at trial; any such other and further legal and equitable relief as the Court deems appropriate or just.

Dated:  January 10, 2023                    Respectfully submitted,


By:    s/Edward F. Harold
EDWARD F. HAROLD
AL Bar No. asb-0669-d55h
FISHER & PHILLIPS LLP
201 St. Charles Avenue, Suite 3710
New Orleans, LA 70170
Telephone: 504-592-3801
Facsimile: 504-529-3850
LKQ Corporation &
Keystone Automotive Industries, Inc.

FP 46050894.1

Craig R. Annunziata (*pro hac vice* application to be filed)
cannunziata@fisherphillips.com
Daniel F. Lanciloti (*pro hac vice* application to be filed)
dlanciloti@fisherphillips.com
James M. Hux, Jr. (*pro hac vice* application to be filed)
jhux@fisherphillips.com
FISHER & PHILLIPS, LLP
10 S. Wacker Drive, Suite 3450
Chicago, IL 60606
(312) 346-8061 (TEL)
(312) 346-3179 (FAX)

FP 46050894.1